Hillsborough, {
  June, 1896. }

BANK COMMISSIONERS *v.* GRANITE STATE PROVIDENT ASSOCIA- TION.

The insolvency of a building and loan association terminates the contracts with its members. Upon settlement of a mortgage held against a member, the mortgagor is to be charged with the amount actually loaned to him, with interest, and credited upon the principal with all payments on the loan account in excess of the legal rate of interest.

Moneys received by an assignor for the payment of interest on mortgages held by third parties are trust funds, and should be paid in full to the mortgagees by the assignee.

PETITION, of the assignee of the Granite State Provident Association, asking for instructions as to the performance of his duties. Facts found by the court.

The Granite State Provident Association, duly incorporated by the legislature (Laws 1881, *c.* 233; Laws 1887, *c.* 281), began business upon the plan of a building and loan association in 1888. In March, 1896, there were about 18,000 members, and of these about 1,700 had borrowed money of the association and given mortgages on real estate to secure their indebtedness. The non-borrowing members were called investors. Each member subscribed for one or more shares of the nominal par value of $200 each, and paid $1 per month as dues on each share of stock so held by him. It was estimated that at the end of eight years the association could pay to each investor the sum of $200 for each share, and deliver up to each borrower any mortgages held against him. Any member might borrow an amount equal to the nominal par value of the shares held by him. A borrower gave two mortgages as security for his loan, the first mortgage being for such an amount of the loan as would readily facilitate

its sale by the association to third parties, while the second mortgage was always held by the association. In the second mortgage the borrower agreed to pay the dues on the shares held by him until they should be worth $200 each, when the value of the shares would be sufficient to extinguish the principal of the mortgage debt; and the association agreed to pay the note secured by the first mortgage, and deliver to the borrower the cancelled mortgages. The shares held by the borrower were assigned to the association as additional security.

In making loans two plans were adopted. On the gross premium plan the borrower gave his notes for the amount loaned, including the premium, which was usually twenty per cent of the total amount. If the borrower gave notes for $1,000 secured by mortgages, the actual amount advanced to him was $800. Such a borrower carried five shares on which he paid $5 per month, $4 on the four shares representing the $800 loaned, and $1 on the premium share; and in addition to this he paid $5 interest each month, $4 being six per cent interest on the $800 advanced, and $1 being six per cent interest on the premium share. The difference between the amount actually loaned and the face of the mortgage notes is the gross premium. On the cash premium plan, a borrower of $800 paid $4 per month on four shares, and $4 per month interest on the amount loaned. In addition to this, he paid a monthly cash premium of $2, or three per cent per annum on the amount loaned. In some instances the cash premium was more than three per cent.

March 18, 1896, upon petition of the bank commissioners, the association was enjoined from doing any further business, and an assignee was appointed to wind up its affairs. He found that prior to his appointment several borrowers had paid the interest on their first mortgages held by third parties, and that these sums had never been paid to the first mortgagees. The mortgages taken by the association were on real estate in several states, and such of them as had not been sold were among the assets turned over to the assignee. In some states ancillary receivers were appointed, who proceeded to collect the amounts due on mortgages of real estate in their respective jurisdictions. Some of the receivers demanded such securities of the assignee, but he refused to surrender them. The assignee asked for instructions as follows:

1. Do all mortgages held by the association against the members become due by the appointment of the assignee, regardless of the times or terms of payment set forth in the same?

2. Can the assignee collect of a borrower any more than the amount actually advanced, or, in other words, can the gross premium be collected?

3. If the gross premium cannot be collected, should the interest

on such gross premium to March 18, 1896, be applied on the amount actually advanced, or be retained according to the tenor of the contract to that date?

4. Should the cash premium paid previous to March 18, 1896, be applied on the amount actually advanced, or be retained according to the tenor of the contract to that date?

5. What disposition should be made of interest paid by members previous to March 18, 1896, to the association and now held by it?

6. Shall the assignee surrender mortgages on real estate in any state where an ancillary receiver has been appointed, to such receiver?

*David A. Taggart* and *Elijah M. Topliff*, for the assignee.

*Harry E. Loveren* and *Lexow, Mackellar & Wells* (of New York), for the New York receiver.

*Harry E. Loveren*, for the Rhode Island and Michigan receivers.

*Streeter, Walker & Hollis* and *Jewett & Plummer*, for the defendants.

CLARK, J. The assignee of the defendant corporation, upon his petition properly brought before the court, asks for instruction in the performance of his duties, and files certain questions setting out the particular matters concerning which he desires information. In the absence of a case calling for a decision, the court is not inclined to answer the first question.

The assignee can collect of a borrowing member only the amount actually advanced by the association. The mortgagor cannot be compelled, under the circumstances, to pay more than the sum actually received by him with legal interest thereon. The insolvency of the defendants terminates their operations as a building and loan association, and the contracts made with borrowing members cannot be enforced. The only thing that remains to be done is to wind up the affairs of the association equitably as to creditors, and as between the members themselves. Borrowers who are required to pay the amounts actually loaned to them, with interest, will be entitled, after the debts of the association have been paid, to a *pro rata* dividend upon their share payments, equally with non-borrowers. They will thus be held to the payment of their share of the losses. *Strohen* v. *Association*, 115 Pa. St. 273.

As the insolvency of the association and the appointment of an assignee have terminated the contracts with the borrowing members, the interest paid upon the gross premiums to March

18, 1896, and the cash premiums paid to the same date, by virtue of those contracts, should be applied in reduction of the amounts actually advanced to the borrowers as a payment made for that purpose. In other words, all payments on the loan accounts in excess of six per cent per annum are to be credited on the principal of the loans, and deducted from the amounts actually advanced to the borrowers in determining their indebtedness to the association.

The money received by the association prior to March 18, 1896, and now in the hands of the assignee, was paid for the purpose of meeting the interest due on the mortgages. Payment to the association was payment to the mortgagees. The association could have no interest in these funds, and no duty to perform, other than to pay to the holders of the first mortgages the sums to which they are severally entitled. The funds were received as trust funds, and must be paid in full by the assignee to the holders of the first mortgages. *York* v. *York Market Co., ante,* p. 419.

The association did business in many states, and the assignee now has in his possession mortgages of real estate in several states where ancillary receivers have been appointed. The assignee can collect none of these mortgages as against the local receivers, who will be forced to resort to foreclosure proceedings in all cases to obtain decrees for the protection of the mortgagors. Under these circumstances, a majority of the court are of opinion that the assignee should deliver the mortgages and evidences of indebtedness in his hands to the local receivers, who will then be enabled to collect and adjust the claims against borrowers in their respective states, leaving the matter of distribution of the funds to the orders and decrees of the courts.

*Case discharged.*

CARPENTER, C. J., and PARSONS and PIKE, JJ., did not sit: the others concurred.